AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Sean Franzblau, (312) 353-5305



FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

SEP - 7 2021

MAGISTRATE JUDGE MARIA VALDEZ
UNITED STATES DISTRICT COURT

**UNDER SEAL**

In the Matter of the Search of:

The person of ███████████████ further
described in Attachment A1

Case Number:

# 21M 574

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Gregory B. Linder, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A1**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B1**

The basis for the search under Fed. R. Crim. P. 41(c) is instrumentalities.

The search is related to a violation of:

*Code Section*

Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2

*Offense Description*

Federal Program Bribery

The application is based on these facts:

**See Attached Affidavit,**

Continued on the attached sheet.

_____
*Applicant's Signature*

GREGORY B. LINDER, Special Agent
Federal Bureau of Investigation
_____
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: September 7, 2021

_____
*Judge's signature*

City and State: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
_____
*Printed name and title*

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Gregory B. Linder, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately 2016. I am currently assigned to a public corruption squad, the primary purpose of which is to identify and investigate public corruption and bribery-related conduct by public officials. Through my training and experience, I am familiar with the techniques used to investigate such violations, including consensual monitoring, surveillance, data analysis, and interviewing witnesses and others who have knowledge of the corrupt activities. I have also participated in the execution of numerous federal search warrants.

2.    This affidavit is made in support of an application for (1) a warrant to search a gray Apple iPhone XS cellular telephone, assigned International Mobile Equipment Identity (IMEI) number 357202093093541 and telephone number (773) ███████ ("**Subject Phone**") for evidence described further in Attachment B, concerning federal program bribery offenses, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2) (the "**Subject Offenses**"); and (2) a warrant to search the person of ██████████████ for purposes of seizing the **Subject Phone**, which was used as an instrumentality of the **Subject Offenses**.

3.    The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons

with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing two search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 666(a)(1)(B) and 666(a)(2), are located within the **Subject Phone**, and that the **Subject Phone** is likely to be in the possession of ███████

## I.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONE

### A.     Factual Background

4.     On or about July 24, 2020, the government applied for a warrant to search (the "20 M 393 application") the iCloud account for Apple ID ████████████ ████████████ The 20 M 393 application is attached to this application as Exhibit 1 and is incorporated herein by reference. The 20 M 393 application established probable cause that: ████████████████████



5.     In summary, as explained in further detail in the 20 M 393 application,



Ex. 1, ¶ 19. According to ████ in April 2019, shortly before ███████████████ ████ that he had arranged with █████████████████████████████████

corroborated in part by independent evidence. *Id.* at ¶¶ 12-14, 20. Approximately two weeks later, ████ met with ████████████ who explained that ████████████ ████████████ had "screwed" ████ by convincing one of the ███████████████████ on a property located at █████████████████████ instead of on a nearby parcel owned by ████ where the developer had originally planned to build ████████████ *Id.* at ¶¶ 21-22 ████ further explained that he had lost over $20,000 on the deal and wanted to retaliate against ████████████████ as a result. *Id.* Immediately after the meeting, ████████ told CS-1 that ████ had a lot of money and would be a "good friend" to ████████████████ *Id.*

6.     According to CS-1, around this same time ████████ was planning several renovations to his new ████████████████████ in Chicago, including approximately ████████████████████████

3



4



9.    On or about July 24, 2020, the Court issued the 20 M 393 warrant, which, among other things, authorized the government to search all Short Message Service (SMS) and Multimedia Message Service (MMS) text messages sent to or from the **Subject Phone** between February 2019 and July 24, 2019 for evidence of the **Subject Offenses**.[2] [As explained in detail in the 20 M 393 application, ███████ is the user of the **Subject Phone**, and the **Subject Phone's** data was backed up to the ████████ iCloud Account during the relevant time period, *see* Ex. 1, ¶¶ 32-33, 65].

B.    <u>Execution of the 20 M 393 Warrant and the Unrecoverable MMS Messages</u>

10.    On or about July 24, 2020, the FBI served the 20 M 393 Warrant on Apple. On or about August 3, 2020, Apple produced the returns in an encrypted format. The encrypted files were then provided to a unit within FBI headquarters to be decrypted. The decrypted files were returned to FBI-Chicago on or about August 24, 2020. At that point, the decrypted files were provided to the FBI's Regional Computer Forensics Laboratory (RCFL) to be analyzed and formatted so that the case agents, including myself, could review the files on a software program used to review the download of digital devices and iCloud content. This review and formatting was completed on or about October 13, 2020.

11.    The RCFL forensic analysis revealed that █████ sent or received

---

[2]    Based on my training and experience, I know that SMS messages are electronic messages that generally contain text only. MMS messages contain multimedia content, including pictures, videos, audio recordings (including voicemails), and contact information. If multimedia content is sent in tandem with text content, the message is typically sent as one MMS.

thousands of Short Message Service (SMS) text messages and Multimedia Message Service (MMS) during the period covered by the 20 M 393 warrant (February 2019 to July 2020). Due to an unexplained technological problem however, few of the MMS messages could be opened or reviewed (the "unrecovered MMS messages").[3] Nevertheless, the forensic analysis did reveal the existence of the unrecovered MMS messages, including the date and time the messages were sent/received, and the other numbers that the MMS messages were sent to/from. Based on this data, the case agents determined that ███████ sent and received over approximately 4,000 MMS messages between February 2019 and July 2020, the vast majority of which agents were not able to view. Approximately 59 of the unrecovered MMS messages were sent between ███████ and ███████████ Under the 20 M 393 warrant, agents were authorized to view all of the unrecovered MMS messages to determine if any were subject to seizure under the parameters of Section A.III. of the 20 M 393 warrant ("Information to be Seized by Law Enforcement Personnel").

12. Between November 2020 and June 2021, case agents, including myself, consulted with RCFL technicians and FBI computer scientists to determine why the unrecovered MMS messages were unviewable. Additionally, the assigned Assistant United States Attorney consulted with an attorney and computer scientist at the Department of Justice's Computer Crimes and Intellectual Property Section (CCIPS).

---

[3] As explained below, agents were able to review the content of SMS messages sent to and from the **Subject Phone**, which led to the discovery of several communications related to the **Subject Offenses** between ███████████████ and others.

Based on these consultations, it was determined that the unrecovered MMS messages could potentially be recovered by the RCFL if it were provided with the original encrypted ███████ Cloud Account returns produced by Apple on or about August 3, 2020 (as opposed to the decrypted version of those returns that were initially provided to the RCFL in or around August or September of 2020). On or about June 14, 2021, the original encrypted returns were provided to the RCFL. On or about June 16, 2021, the case agents were notified by an RCFL technician that he was unable to recover any of the unrecovered MMS messages from the original encrypted returns. The RCFL technician then submitted the original encrypted returns to FBI headquarters in a final attempt to decrypt the original returns and recover the unrecovered MMS messages.[4] FBI headquarters returned the decrypted files to FBI-Chicago on or about June 30, 2021. I reviewed these files on or about July 7, 2021 and determined that nearly all of the unrecovered MMS messages were still unviewable.

13. Because reasonably diligent efforts have failed to recover the unrecovered MMS messages from the original ███████ iCloud Account returns, the government now seeks warrants authorizing it to seize the **Subject Phone** from ███████ and search the **Subject Phone** for the unrecovered MMS messages.

C. The Evidence Found Within the SMS Messages Recovered from the ███████ iCloud Account Strengthen the Probable Cause that the Unrecovered MMS Messages Contain Evidence of the **Subject Offenses**

---

[4] This was done because, according to RCFL personnel, there was a possibility that updates in decryption technology at FBI Headquarters would allow for the recovery of the missing MMS messages.

14.     As explained above, the information contained in the 20 M 393 Application provided probable cause to search all of the unrecovered MMS messages for evidence of the **Subject Offenses**. That probable cause, however, has been significantly strengthened based on the content of the SMS messages recovered from the ██████ iCloud Account, which corroborate CS-1 in several significant ways.

       *i.* ███████████████████████████████████

15.     For example, a series of SMS messages sent between ████████ and ████ n the week or so leading up to ████████████████████



16.     The above exchange is significant for several reasons. As explained in detail in the 20 M 393 warrant, ████ had no legitimate role in ████ so it is unusual that ████ thought it necessary to meet with ████—an ostensibly disinterested party—to discuss ████ n the days leading up to the formal announcement of ████ ████ Second, based on my training and experience, it is unusual for a ████ to meet with a ████

10



ii.    ████████████████████

17.    The SMS messages recovered from ████ iCloud Account also corroborate that ████████████ were frequently meeting with one another in the spring of 2019—████████████████████—under similar circumstances to what CS-1 described. For example, as explained in the 20 M 393 Application (¶ 21-22) and in the background section above, CS-1 stated that on or about May 7, 2019, ████████

18.    Agents recovered several text messages from the ████ iCloud Account

11

that corroborate 

19.     As explained in further detail in the 20 M 393 Application (¶¶ 24-29), CS-1 stated that shortly after the May 7, 2020,

12



13











26.   The SMS messages recovered from the ██████ iCloud Account also

demonstrated that by May 18, 2019, █████ had done certain things for ████████

that made ████████ feel indebted to ████████████ was starting to take

certain ████████████ to reciprocate. This is highly significant because, as

explained in detail in the 20 M 393 application, there is substantial evidence that the

████████████████████████████████████████████████████

████████████████ *See* Exhibit 2, ¶¶ 24, 33, 34, These messages included a

May 18, 2020 message sent from ████████████ (10:19 a.m.): "I want to take

[yo]u and █████ out to dinner. Wherever y[ou]r favorite place is."

    27. The following day, May 19, 2020, ████████████ had a text

exchange in which ████████████████████████████████

████████████████████████████████████████████████████



███████████████████████████████

**D.** **There is Probable Cause to Believe that the Subject Phone Currently Contains at least some of the Missing MMS Messages**

28.     Based on my review of subscriber records received from Verizon, I know that ██████ used the **Subject Phone** during the entire period covered by the 20 M 393 warrant (February 2019 to July 24, 2020), and that ██████ has continued to use the same device as of August 4, 2021. Specifically, based on my training and experience, I know that all cellphones are assigned a unique International Equipment Mobile Identity (IMEI) number that allows the service provider to identify the specific device used by a customer. Based on my review of Verizon records, ██████ has been the subscriber of telephone number ████████████ since approximately 2012, and has continuously used the **Subject Phone** (assigned IMEI number 357202093093541) since at least approximately December 2018.

29.     According to Apple and Verizon records, the **Subject Phone** has 512 gigabytes of storage capacity, which is the largest storage capacity that Apple offers for the iPhone XS model.

30.     Based on my training and experience, I know that the only way that text messages (both SMS and MMS) sent or received over Apple iPhones can be removed from the device is through manual deletion. Based on my training and experience, most iPhone users do not manually delete text messages (at least as a routine matter) because it is relatively labor intensive and, in most cases, unnecessary from a storage

19

capacity standpoint. Because the **Subject Phone** has 512 gigabytes of storage capacity—which is an enormous amount of storage space for a personal phone—I believe it is highly unlikely that ███████ has exceeded the **Subject Phone**'s storage capacity limitations such that he would have been forced to manually delete text messages to create extra storage space on his phone.

## II. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

31. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly

20

technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

32. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

33. In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

34. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as

21

fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may

enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

   d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

   e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

   f. I also know from my training and experience, as well as from

23

information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Face ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using Face ID for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

      g.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the

ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

        h.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## III.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

        35.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

        36.    The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following

techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

      a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

      b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

      d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

37.    The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the

removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## IV.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH ███████████████ ██████

38.    Based on my training and experience, I know that it is customary for individuals who use cellular telephones to carry the devices on their person.



40.    Therefore, the warrant in support of which this affidavit is submitted also seeks authorization to search the person of █████████████████ for the **Subject Phone**.

## V.    CONCLUSION

41.    Based on the above information, I respectfully submit that there is probable cause to believe that federal program bribery offenses, in violation of Title 18, United States Code, Section 666(a)(1)(B) and 666(a)(2), have been committed, that evidence relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phone**, as further described in Attachment A, and that the **Subject Phone** is carried on the person of █████████████████ therefore respectfully request that this Court issue a search warrant for (1) ████████████

27

███ person (as more particularly described in Attachment A1) for purposes of locating and seizing the **Subject Phone** (as more particularly described in Attachments B1 and A2); and (2) the **Subject Phone**, authorizing the seizure of the items described in Attachment B2, pursuant to the protocol described in the addendum to Attachment B2.

FURTHER AFFIANT SAYETH NOT.

_____
Gregory B. Linder
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone 7th day of September, 2021

_____
Honorable MARIA VALDEZ
United States Magistrate Judge

28

## ATTACHMENT A1

### DESCRIPTION OF ITEM TO BE SEARCHED

1. ███████████████ who appears to be approximately 5'8" in height and 200 pounds in weight, as further described in the photograph below, but limited to the search and seizure of the cellular telephone further described in Attachment B below.



## ATTACHMENT B1

### LIST OF ITEMS TO BE SEIZED

Instrumentality involved in violations of Title 18, United States Code, Section 666(a)(1)(B) and 666(a)(2), as follows:

      1.     The gray Apple iPhone XS bearing IMEI number 357202093093541 and assigned telephone number ██████████ (the "**Subject Phone**").